30

FILED

LTRF

MAY 18 2015

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re                                        Case No. 09-16160-A-7

Juan Enrique Hurtado,

           Debtor.

_____/

Patti Jones,                                 Adv. No. 11-1102

           Plaintiff,

     vs.

Juan Enrique Hurtado,

           Defendant.

_____/

**MEMORANDUM**

This is an adversary proceeding to except a debt from discharge. 11 U.S.C. §§ 523, 1328(a). Its resolution requires a two-step analysis. First, did Juan Hurtado ("Hurtado") owe Patti Jones ("Jones") money on the date he filed bankruptcy? Applying California contract and surety law, as well as the Statute of Frauds, the court finds that a settlement agreement between Jones and Hurtado created such a debt. Since the parties concede that Jones had neither timely notice, nor actual knowledge, of Hurtado's bankruptcy, that debt is nondischargeable. 11 U.S.C. § 523(a)(3). With interest, the amount of the debt is now $363,089.32.

Second, how much, if any, of the $363,089.32 is nondischargeable for additional reasons independent of Hurtado's failure of scheduling and notice?[1] Stated differently, what portion of the nondischargeable settlement debt is also nondischargeable because it falls within one of the bad acts exceptions specified in 11 U.S.C. § 523(a)(2), (4), or (6), and would be nondischargeable notwithstanding the settlement agreement and even if Jones had been properly given notice of the bankruptcy? *See Archer v. Warner*, 538 U.S. 314 (2003). Jones advances two theories beyond a failure of notice as grounds to except the settlement debt from discharge: fraud arising from Hurtado's representation that he was a licensed architect, 11 U.S.C. § 523(a)(2)(A) and embezzlement associated with the misappropriate of a $125,000 deposit Jones gave to Hurtado's corporation, Urban Design Concepts, Inc. ("URDECO"), 11 U.S.C. § 523(a)(4). Jones has sustained her burden of proof on the fraud claim and, even if Hurtado had given Jones timely notice of the bankruptcy, $312,155.14 of the $363,089.32 arose from nondischargeable fraud. Jones has not sustained her burden of proof on the embezzlement claim.

---

[1]    Accurate characterization of the amount of the debt and precise subdivision § 523(a) under which it is excepted from discharge is important because that portion of Hurtado's debt to Jones that is excepted from discharge only under 11 U.S.C.  § 523(a)(3)  can be discharged in a subsequent bankruptcy. 11 U.S.C. § 523(b). But that portion of the debt deemed nondischargeable under other subdivisions, i.e. § 523(a)(2),(4), will not be discharged by a subsequent bankruptcy, absent payment. *Paine v. Griffin (In re Paine)*, 283 B.R. 33, 38 (B.A.P. 9th Cir. 2002).

**Facts**

This dispute arose out of a residential construction project in Rancho Santa Fe, an exclusive planned community in San Diego County. Rancho Santa Fe operates under the watchful eye of its homeowners' association. Among other things, the homeowners' association exercises design control over houses in the subdivision and only allows licensed architects to design homes for construction within the subdivision. The homeowners' association also has the authority to approve, or disapprove, contractors employed to construct residences within the development.

During the times relevant to this proceeding, Hurtado, also known as John Hurtado, was a licensed contractor. Hurtado holds a degree in architecture and has designed or built 30 homes. He is not a licensed architect. Hurtado co-owned and operated several residential development companies.

Hurtado and Eric Blossman formed URDECO to build custom and spec homes. Blossman and Hurtado brought different things to the company. Blossman had access to construction financing; he worked in URDECO's office performing administrative tasks. Hurtado was a licensed contractor, under whose license URDECO constructed homes, and he oversaw construction.

Jones wanted to build a home in Rancho Santa Fe. She purchased a lot in Rancho Santa Fe and hired a licensed architect to design her home. The architect drew plans, and the plans were approved by San Diego County, as well as by the Rancho Santa Fe homeowners' association. Thereafter, she hired a general contractor who graded the lot and started work on the foundation. But shortly after construction began, Rancho Santa Fe demanded that the contractor purchase a premium-priced insurance policy, which Jones's contractor deemed cost prohibitive. Jones and the contractor parted ways, and Jones searched for a replacement contractor.

Jones then spoke with URDECO about serving as the general contractor for the construction of her home upon learning that URDECO was already engaged in construction in Rancho Santa Fe, and thus had apparently already been approved by the homeowners' association. During these discussions, Hurtado was URDECO's primary spokesman. Hurtado told Jones that he owned URDECO, held the

contractor's license under which URDECO worked, was an architect, had been approved by the homeowners' association to build in Rancho Santa Fe, and would be in charge of "all aspects" of the construction of her home. Hurtado further told her that Blossman's role in the company was administrative. Jones liked that Hurtado (1) was an architect; (2) held a general contractor's license; and (3) was already approved by Rancho Santa Fe homeowners' association as a builder.

On the day that Hurtado first met Jones, he asked for, and Jones gave him, computer-aided design files for her home, which had been prepared by Jones's architect.

Three days after their first meeting, Hurtado sent Jones an email, which stated, "I'm anxious to prove that we are better than the builders that claim they are the 'Ferraris' of builders."

Over the next month, Hurtado started revising Jones's plans. Changes included modification of the entry tower, arches, columns, windows' elevations, and ceiling heights. Jones recalls that Hurtado told her that he "didn't like what [her architect] ha[d] done," that her architect had done her "no favors," that it was a "very poor design," that there were problems with the plans, that she was "lucky that [Hurtado] was an architect, and that he would fix the plans if she hired URDECO to build the home. After listening to Hurtado, Jones felt that her plans were "completely messed up." She was grateful that Hurtado was willing and able to help her resolve the problems.

Later, Jones recalls, Hurtado explained how URDECO handled its construction projects. Among other things, Jones remembers that Hurtado told her that URDECO opened a separate bank account for each construction project to segregate funds.

Perceiving URDECO could both correct the design defects and construct her residence, Jones selected URDECO as a replacement contractor. URDECO and Jones signed a "Residential Construction Contract." The contract called for URDECO to construct Jones's residence in Rancho Santa Fe, supplying the necessary labor and materials to do so. The contract provided that URDECO would build the house to conform to the plans of her previous architect, and it contained no mention of any design work to be performed by URDECO or Hurtado. For her part, Jones agreed to pay URDECO

4

costs, estimated at $2.26 million dollars, and a builder's fee of $337,200. The parties agreed to progress payments implemented by an invoicing system. Not more often than monthly, URDECO was entitled to submit a request for payment, comprising costs incurred plus a pro-rata portion of the builder's fee. Jones promised to pay invoices, less a 10% retention amount, promptly. The contract also called for an "initial payment" of $226,003.25 by Jones not later than ten days after execution of the contract. In describing the initial payment, the contract provided, "No part of this initial payment shall be applied to the Builder's Fee, but rather this initial payment shall be used by the Builder to purchase materials and labor for use at the Project." The contract made no mention of a segregated account for monies for Jones's project.

But URDECO did establish a separate account for Jones's project. And when Jones made her initial payment of $125,000, slightly more than one-half of the amounts called for by the contract, URDECO did deposit the money into that account. Unbeknownst to Jones, three days after Jones made that payment and before it had performed work on Jones's house, URDECO transferred $80,000 from that account to its own savings account. These funds were not applied to Jones's project.

For approximately the next year, URDECO performed construction services on Jones's residence. Jones and URDECO, acting mostly through Hurtado, enjoyed a troubled relationship. Jones was a particularly vigilant property owner. She asked many questions and often requested changes to her home. Throughout the time that URDECO worked on Jones's house, Hurtado made design changes, some of which were made at Jones's request and some of which he had suggested. Hurtado described his design changes as aesthetic.

A recurring problem was URDECO's billing. Prior to commencement of work by URDECO, Jones paid URDECO $125,000, which was to be used for labor and materials for her project. During the early months of URDECO's work, URDECO's invoices did not reflect work in excess of the $125,000 deposit. But URDECO regularly sent Jones invoices for labor and materials. Unable to

understand how she owed money, Jones made inquiry of URDECO but did not receive an accounting. She did, however, pay URDECO's invoices.

Eventually, URDECO and Jones terminated their relationship, and Jones finished the project with another contractor. After terminating URDECO, Jones asked San Diego County for an inspection of her still-under-construction home. The county refused to approve Hurtado's changes to the plans and required her to redo approximately $290,000 of Hurtado's design changes. In most instances, the county forced Jones to reconstruct portions of her home to match the drawings prepared by her original architect.

In San Diego County, Jones filed a civil action against eleven defendants including URDECO, Hurtado, Blossman, and others (the "state court action"). *Jones v. Urban Design Concepts, Inc.*, No. 37-2007-000054451-CU-JR-NC (San Diego Superior Court 2007). Among other things, Jones pled claims against Hurtado and URDECO for negligence, fraud, conversion and appointment of a receiver.[2]

Jones and Hurtado met to discuss the dispute. Hurtado explained that Blossman was leaving URDECO and inquired of Jones as to whether she would allow Hurtado, personally, to complete construction of her residence for an additional $50,000 to 75,000 builder's fee payable upon completion of the work. Jones recalls that Hurtado promised to repay her monies associated with the project. Though Hurtado's return to the project did not occur, Jones and Hurtado did negotiate a resolution of hostilities. Later, Jones emailed Hurtado confirming the agreement, which provided:

Per our discussions last week (and as documented by Dave Cotton), we discussed/agreed to the following:

1. John to resolve all liens against Patti's property as soon as possible so that Patti can get the house project under way again[;]

2. John to indemnify Patti against monies owed to Patti by all subs (sic); John and Patti to work together to get monies returned from subs (Focus, Old World, and Capo

---

[2] Though not admitted at trial, the court takes judicial notice, Fed. R. Evid. 201, of the First Amended Complaint filed in *Jones v. Urban Design Concepts, Inc.*, No. 37-2007-000054451-CU-JR-NC (San Diego Superior Court 2007).

6

Valley); Kiesler will be the highest priority subcontractor/vendor.  John will accept responsibility to repay the Kiesler Enterprises debt including interest[;]

3.  John will repay the $125,000 deposit plus Patti's legal fees (approximately $30,000 to date), with interest, based on a repayment plan to be determined, after showing Patti his contract back log and cash flow[; and]

4.  John and other parties to the lawsuit to accept a stipulated judgment that becomes effective in the event that John fails to fulfill any aspect of the settlement; Patti will grant John 1 additional week for currently-due court filings pending finalization of the settlement agreement terms . . . .

In a reply email, Hurtado showed that he had agreed:

Those 4 items are what I agreed to with you when we met.  Dave's email to us outlining the key issues was accurate as well.

I am working with Dave to get the liens resolved and I received your fax yesterday from the title company.  I have contacted them about what to do with regards to payment.  Attached is my WIP and AR aging.  I need to survive my AR's in the next 65 days . . . .

Best,

John

Later, Hurtado refused to proceed with the settlement.

The San Diego state court action remains unresolved.

**Procedure**

Unable to resolve his debt problems, Hurtado filed chapter 13 bankruptcy.  *In re Hurtado*, No. 09-16160 (Bankr. E.D. Cal. June 30, 2009).  The parties concede that Jones was not noticed in Hurtado's schedules and did not otherwise know of the bankruptcy until after the bar dates for claims and adversary proceedings.

Later, Jones filed this adversary proceeding to determine whether Hurtado owes a debt to Jones that should be excepted from discharge.  Jones brings claims for (1) fraud under 11 U.S.C. § 523(a)(2) arising from Hurtado's misrepresentations that he was a licensed architect; (2) embezzlement under 11 U.S.C. § 523(a)(4) by Hurtado personally, or embezzlement by Blossman for which Hurtado is vicariously liable; and (3) failure by Hurtado to schedule the debt timely under 11 U.S.C. § 523(a)(3) resulting in lack of notice to Jones.  Hurtado denies such claims and, particularly, denies personally owing Jones any money, noting that any debt owed to Jones was owed by URDECO.

7

The court held a trial of more than 7 days on these claims.  The parties have submitted post-trial briefs.

## Jurisdiction

This court has jurisdiction. *See* 28 U.S.C. §§ 1334, 157(a); 11 U.S.C. § 523; General Order No. 182 of the U.S. District Court for the Eastern District of California.  This is a core proceeding in which this court may enter final judgment. *See* 28 U.S.C. § 157(b)(2)(i); *Carpenters Pension Trust Fund for N. Cal. v. Moxley*, 734 F.3d 864, 868 (9th Cir. 2013).

## Discussion

A creditor seeking to except a debt from discharge bears the burden of proof.  *Grogan v. Garner*, 498 U.S. 279, 289 (1991).  The creditor must prove each element of the exception by a preponderance of the evidence. *Id.*

## I.    Debt Owed to an Unscheduled Creditor

To except a debt from discharge, the creditor must prove that a debt exists and that the debt falls within one of the enumerated paragraphs of subsection (a) of § 523. *See* 11 U.S.C. § 523(a).  One such paragraph excepts from discharge debts held by creditors who were neither given notice of the bankruptcy, nor otherwise had notice or actual knowledge of it, in time to file a proof of claim or to prosecute an adversary proceeding to except their debt from discharge:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (3) neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—(A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request[.]

11 U.S.C. § 523(a)(3); *see also* 11 U.S.C. § 1328(a)(2).

Here, the parties concede that Jones and her debt were neither listed nor scheduled under § 521(a)(1) and that Jones did not have notice or actual knowledge of the bankruptcy sufficiently in advance of the bar dates for filing a timely proof of claim or adversary proceeding.  But the parties

disagree on whether Hurtado, as opposed to URDECO, actually owed Jones money.  Two possible theories exist for holding Hurtado liable for URDECO's debt to Jones.

### A.    Hurtado's Settlement with Jones and Promise to Answer for URDECO's Debt

Jones contends that Hurtado, personally, assumed URDECO's debt to her for the down payment for custom cabinetry from Kiesler Cabinets and for the $125,000.00 initial deposit.  As a basis for Hurtado's personal liability, Jones points to the two emails memorializing the settlement agreement between Jones and Hurtado.  In the settlement agreement, Hurtado agreed that he would resolve third-party liens against Jones's property, indemnify Jones against claims of subcontractors, repay Jones the $81,365.00 down payment for Kiesler Cabinets, repay Jones the $125,000.00 initial deposit, and pay Jones her legal fees in the state court action.  Jones agreed to give Hurtado an extension of time to respond to her complaint filed in the San Diego state court.  The parties mutually agreed to a stipulated judgment to enforce the settlement in the event that Hurtado failed to perform under the terms of the settlement agreement.

### 1.    Was Assumption of the Debt Tried by Consent?

Hurtado's assumption of the debt was not fairly raised by the pleadings.  *See* Third Am. Compl., filed June 16, 2014, ECF #203.  While Jones's complaint pleads that she is an unscheduled creditor who was otherwise unaware of Hurtado's bankruptcy, Jones's complaint only seeks relief as to debts of the kind described in 11 U.S.C. § 523(a)(2) and (4).  *Id.* at ¶ 28(c).  The pertinent portion of the Third Amended Complaint provides:

> a. Jones was not properly listed or scheduled by Hurtado in his Chapter 13 bankruptcy case in time to permit the timely filing of a Proof of Claim and timely request for determination of dischargeability of debt under 11 U.S.C. § 523(a)(2) and/or (4) and Jones did not have notice or actual knowledge of Hurtado's bankruptcy case in time for such timely filing and request;
>
> b. Jones was never served with any type of notice of, or pertaining to, Hurtado's bankruptcy proceeding, and Jones had no knowledge whatsoever of the existence of Hurtado's bankruptcy proceeding until August 2010;
>
> c. *The pre-petition debt owed by Hurtado to Jones, as embodied in the State Court action, is of a kind specified in 11 U.S.C. §§ [sic] 523(a)(2) and/or (4), is not*

> *dischargeable in Hurtado's bankruptcy case, and is not dischargeable in any case under Title 11 of the United States Code.*

Third Am. Compl. ¶ 28, filed June 16, 2014, ECF # 203 (emphasis added).

When an issue is tried, moreover, that was not raised by the pleadings, a party may move to amend the pleadings to conform to proof when the issue was tried by the parties' consent. *See* Fed. R. Civ. P. 15(b), *incorporated by* Fed. R. Bankr. P. 7015. Even without a formal amendment, "a district court may amend the pleadings merely by entering findings on the unpleaded issues." *Galindo v. Stoody Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986). Thus, an issue not raised by the pleadings may be deemed to have been raised in the pleadings even when the pleadings were not amended and no motion to amend was filed:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2). Amendment is proper if the nonmoving party consented to trial of the issue and is not prejudiced by the amendment. *See Prieto v. Paul Revere Life Ins. Co.*, 354 F.3d 1005, 1012 (9th Cir. 2004); *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 901 (4th Cir. 1996). By inference, the court's deeming an issue to have been raised in the pleadings by entering findings on that issue would also be proper if the parties' consented to trial of the issue and no prejudice resulted. Consent to trial of an unpleaded issue may be express or implied. *Freeman v. Chi. Park Dist.*, 189 F.3d 613, 618 (7th Cir. 1999). "To establish implied consent, the [moving party] must demonstrate that [the nonmoving party] understood evidence had been introduced to prove [the new issue], and that [the new issue] had been directly addressed, not merely inferentially raised by incidental evidence." *LaLonde v. Davis*, 879 F.2d 665, 667 (9th Cir. 1989) (citations omitted); *see also Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 814 (9th Cir. 1994).

The court finds that Hurtado's assumption of URDECO's debts to Jones, the debts for Jones's deposit for Kiesler Enterprises in the amount of $81,365.00 and Jones's initial deposit of $125,000.00, is

an issue that was tried by the implied consent of the parties. Further, no prejudice to Hurtado results

from treating the issue as if raised in the pleadings given the parties' consent to trial of the issue.

Implied consent is found in Hurtado's failure to object (or more precisely, his objection and then

withdrawal of the objection) when evidence of the settlement agreement was first introduced. *See*

*Shen v. Leo A. Daly Co.*, 222 F.3d 472, 479 (8th Cir. 2000); *Winger v. Winger*, 82 F.3d 140, 143

(consent to trial of unpleaded issues found based on failure to object to evidence and jury instructions).

The relevant exchanges at trial were as follows:

Mr. Burton [counsel for Jones]:

Q.     Did you meet with Mr. Hurtado after that date?

A.     He called me in August 2007. He e-mailed me, actually. He didn't call, he e-mailed.

Q.     Did you have a meeting with Mr. Hurtado?

A.     Yes.

Q.     What did he say at that meeting?

A.     He said that he had an alternative to the way things had ended, the project was over. He wanted to talk to me about the alternative.

Q.     What did he say?

Mr. Moquin [counsel for Hurtado]: Your Honor, I object. This is discussion of settlement negotiations.

Mr. Burton: I think this is an admission, your honor.

The Court: I don't know if it is a settlement discussion or not until I have heard it. I heard her use the word "alternative." I never heard the word "settlement." Until I get into the substance, I don't know if it is settlement or not. I'm going to reserve the objection. I'll hear the testimony, and then I'll rule on it.

Mr. Burton: Okay.

By Mr. Burton:

Q.     Did he say anything about – well, did he mention anything about the –whether URDECO was terminated?

A.     URDECO was already terminated by that point.

Q.    I mean the business.

A.    He said Eric was leaving the business, and he wanted to do – to know if I
      would let him do the  project on his own for a management fee that was 50 to
      $75,000, and he said that I wouldn't have  to pay the management fee until the
      end of the project.  He would finish the job.  That's what he said about it.

Q.    Did he say anything about Kiesler cabinets?

A.    He says he knows he owes the money, and he would pay me back.

Q.    Pay you back what?

A.    Pay me back the Kiesler deposit.

Q.    Did he say anything about paying anything else back?

A.    Yes.  He said he would pay back the 125, and we came up with a payment
      plan.

The Court: Is that the end of the line of questioning, Mr. Burton?

Mr. Burton: Yes.

The Court: Mr. Moquin?

Mr. Moquin: Your Honor, I withdraw my objection.

The Court: You're withdrawing?

Mr. Moquin: I withdraw it.

Such evidence was not probative on either the fraud claim, 11 U.S.C. § 523(a)(2)(A), or the

embezzlement claim, 11 U.S.C. § 523(a)(4).  Thus, the court infers Hurtado's understanding, and by

extension, his implied consent, to trial of this new, unpleaded issue.

      Further, Hurtado impliedly consented to trial of the issue by also eliciting testimony from Jones

on the issue.  *LeFever v. C.I.R.*, 100 F.3d 778, 785 (10th Cir. 1996) (introduction of evidence by the

party opposing the motion may be deemed to be consent).  After Jones testified on direct examination

about the settlement agreement, but before she attempted to introduce the email string, Hurtado cross-

examined her at length.  Thereafter, Jones admitted the email string memorializing Hurtado's promise to

stand for URDECO's debt.  Exh. P.  That exhibit was admitted over Hurtado's objection to admission of

settlement discussions, Fed. R. Evid. 408, and objection based on relevance given that the promise to

stand for the debt of another was unpled, Fed. R. Evid. 402. The court overruled the Rule 408

objection, finding waiver based on Hurtado's earlier withdrawal of the objection and the prior admission

of testimony about the settlement agreement, but the court deferred ruling on the relevance as to

Hurtado's alleged promise to stand for URDECO's debt. At that time, the court specifically called to

Hurtado's attention the possibility of trial by consent under Federal Rule of Civil Procedure 15(b),

incorporated by Federal Rule of Bankruptcy Procedure 7015. And Hurtado once again questioned

Jones about the agreement.

     In short, Hurtado withdrew his objection to testimony about the settlement agreement, and such

testimony was admitted. He cross-examined Jones about the settlement both before and after admission

of the email string memorializing the settlement. The court finds that Hurtado impliedly consented to

trial of the issue whether Hurtado assumed URDECO's debt to Jones by agreeing to the settlement.

     **2.**    **Did Hurtado Settle with Jones and Promise to Answer for URDECO's Debt?**

     "While federal law controls the issue of nondischargeability, a determination of the existence

and amount of the underlying debt is controlled by state law or other relevant non-bankruptcy law.

*Grogan v. Garner,* 498 U.S. 279, 283, 284 n.9 (1991); *Cohen v. de la Cruz,* 523 U.S. 213, 223 (1998)

(applying state law to determine total amount of a nondischargeable claim, including punitive

damages)." *In re Cupit*, 514 B.R. 42, 56–57 (Bankr. D. Colo. 2014).

     One who promises to answer for the debt of another is a surety or guarantor. Cal. Civ. Code

§ 2787. Contract law governs guarantors and sureties. Restatement (Third) of Suretyship & Guaranty

§ 7.

     Under basic contract law, "[a]n offer is the manifestation of willingness to enter into a bargain,

so made as to justify another person in understanding that his assent to that bargain is invited and will

conclude it." Restatement (Second) of Contracts § 24. "Acceptance of an offer is a manifestation of

assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Id.* at

§ 50(1). Here, the exchanged emails support a finding of an offer and acceptance that created an enforceable contract between Jones and Hurtado. Agreements reduced to writing are presumed to be supported by consideration. Cal. Civ. Code § 1614. Consideration may be an act, forbearance, change in legal rights, or a promise. Restatement (Second) of Contracts § 71(3). "Consideration may be forbearance to sue on a claim, an extension of time, or any other giving up of a legal right, in consideration of some promise." 1 Witkin, *Summary of California Law*, Contracts § 211 (10th ed. 2012); *Krobitzsch v. Middleton*, 72 Cal. App. 2d 804, 809 (1946) (a one-day forbearance to serve notice of default is sufficient). Hurtado promised to pay Jones money and remove third-party liens. Jones settled her lawsuit against Hurtado and gave him an extension of time for his court filings, which was sufficient consideration to make Hurtado's promises enforceable under contract law.

The fact that the parties contemplated memorialization does not necessarily suggest that the discussion between the parties was a preliminary negotiation that did not create an enforceable contract. The question is whether the objective intent of the parties as expressed in the instrument is that of a final agreement:

> Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole. *The objective intent as evidenced by the words of the instrument, not the parties' subjective intent, governs our interpretation.*
>
> Where the writing at issue shows "no more than an intent to further reduce the informal writing to a more formal one" the failure to follow it with a more formal writing does not negate the existence of the prior contract. However, where the writing shows it was not intended to be binding until a formal written contract is executed, there is no contract.

*Harris v. Rudin, Richman & Appel*, 74 Cal. App. 4th 299, 307 (1999) (emphasis added) (citations and internal quotation marks omitted).

Other than the time for Hurtado's performance of the settlement agreement's terms, including repayment of the initial deposit, the court finds no ambiguity in the emails and determines the parties' objective intent to be bound from the instrument. Each party uses the past tense "agreed" when

14

describing the terms of the discussions. Neither party suggests that further agreement is required before the terms become binding. Moreover, Hurtado's efforts to remove the third-party liens suggest that he is performing under the settlement agreement's terms. For each of these reasons, the court finds the parties' objective intent for the emails to be a binding agreement between them.

In addition to general contractual principles, an agreement to answer for the debt of another must also pass muster under guaranty and suretyship law as well as the Statute of Frauds. A guaranty has three elements. It must be (1) in writing, unless otherwise excepted by the statute, Cal. Civ. Code §§ 2793–2794; (2) signed by the guarantor, Cal. Civ. Code § 2793; and (3) supported by independent consideration, unless excepted by the statute, Cal. Civ. Code § 2792.

Each of the three elements for a guaranty is satisfied in this case. The agreement was in writing. Hurtado's typewritten name "John" appears at the bottom of his email, which is sufficient to constitute a signature. The agreement was supported by independent consideration. A creditor's agreement to give up or forbear exercising the creditor's rights is consideration. *Beverly Hills Nat'l Bank v. Glynn*, 267 Cal. App. 2d 859 (1968). A compromise of a claim is also consideration. *Fairchild v. Cartwright*, 39 Cal. App. 118 (1918) (a corporate creditor's agreement to accept a lesser amount from a corporate director is sufficient consideration). The Restatement (Third) of Suretyship & Guaranty describes the consideration necessary for enforceable guaranties:

> A secondary obligation does not fail for lack of consideration if: (a) the underlying obligation is supported by consideration and the later creation of the secondary obligation was part of the exchange for which the obligee bargained; or (b) the promise of the secondary obligor is in writing and signed by the secondary obligor and recites a nominal purported consideration; . . . . (d) the secondary obligor should reasonably expect its promise to induce action or forbearance of a substantial character on the part of the obligee or a third person, and the promise does induce such action or forbearance.

Restatement (Third) of Suretyship & Guaranty § 9 (1996).

The agreement memorialized by the parties' emails recites consideration. Hurtado promised to resolve liens against Jones's property, to indemnify Jones from subcontractors' claims, to repay the Kiesler Cabinets deposit, to repay the $125,000 initial deposit, and pay Jones's legal fees. In exchange

for Hurtado's promises, Jones agreed to extend time for Hurtado to file pleadings in the state court action and to accept a stipulated judgment resolving the matter as to both URDECO and Hurtado. Accordingly, the email exchange between Jones and Hurtado satisfies the requirements for an enforceable guaranty.

Finally, such an agreement must comply with the Statute of Frauds. Cal. Civ. Code § 1624(a)(2). "Unless additional requirements are prescribed by the particular statute, a contract within the Statute of Frauds is enforceable if it is evidenced by any writing, signed by or on behalf of the party to be charged, which (a) reasonably identifies the subject matter of the contract, (b) is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and (c) states with reasonable certainty the essential terms of the unperformed promises in the contract." Restatement (Second) of Contracts § 131 (1981).

In this case, a writing exists and is signed. *Donovan v. RRL Corp.*, 26 Cal.4th 261, 276-78 (2001). The term "signed" includes any symbol adopted by a party with the intent to authenticate a writing. *Id.* (defendant's printed name in an advertisement satisfied the Statute of Frauds).

The only issue is whether the emails recite the essential terms of the agreement. "The degree of particularity with which the terms of the contract must be set out cannot be reduced to a formula. The writing must be the agreement or a memorandum 'thereof'; a memorandum of a different agreement will not suffice. The 'essential' terms of unperformed promises must be stated; 'details or particulars' need not. What is essential depends on the agreement and its context and also on the subsequent conduct of the parties, including the dispute which arises and the remedy sought. Omission or erroneous statement of an agreed term makes no difference if the same term is supplied by implication or by rule of law. . . ." Restatement (Second) of Contracts § 131 cmt. g (1981). Here, the only terms left unspecified are the time in which Hurtado must resolve all liens, which is stated as being "as soon as possible," and the payment schedule for repayment of the $125,000, which is left "to be determined." But time for performance need not be specified in a contract. *Standard Box Co. v. Mutual Biscuit Co.,*

10 Cal. App. 746, 750 (1909) (implying reasonable time for performance); *Fogler v. Purkiser*, 127 Cal. App. 554, 559 (1932). As a result, the Statute of Frauds has been satisfied for the parties' emails memorializing their settlement.

In short, the court finds a binding agreement between the parties, which the court believes was intended as a global resolution of the dispute. The court believes that the parties intended this agreement to address all issues arising from URDECO and Hurtado's work on Jones's residence and their transactions with Jones. The breadth of the agreement coupled with a lack of reservation of the parties' rights suggests an intent to settle all disputes. Further, at the time the agreement was entered Jones was aware that Hurtado's architectural work was flawed. And the use of a stipulated judgment implies global resolution of the disputes arising from the parties' relationship and the construction project. California applies the doctrines of merger and bar to stipulated judgments. *California State Auto. Assn. Inter-Ins. Bureau v. Super. Ct.*, 50 Cal. 3d 658, 664 (1990). Under these doctrines, Jones would later be barred from pursuing new and additional theories or damages arising from the construction of her residence. Thus, the parties' choice of a stipulated judgment that could have claim-preclusive effect on all claims arising out of the same transaction suggests that all claims relating to the parties' transaction were being relinquished and included in the scope of the settlement.

### 3.    Damages

#### a.    Debts Assumed

Hurtado assumed the obligation to repay the Kiesler debt of $81,365.00. He also assumed the obligation to repay Jones's initial deposit of $125,000.00. These debts total $206,365.00.

#### b.    Interest

An award of prejudgment interest in a § 523 proceeding in which the creditor prevails ensures the creditor is made whole and has a full recovery. *See Cohen v. de la Cruz*, 523 U.S. 213, 222–23 (1998). Such an award lies within the sound discretion of the bankruptcy court. *Saccheri v. St. Lawrence Valley Dairy (In re Saccheri)*, BAP No. 12–1269–JuKiD, 2012 WL 5359512 (B.A.P. 9th Cir.

2012); *see also* Cal. Civ. Code § 3289. State law governs the applicable interest rate. *DeVries v. Clark (In re Clark)*, Adv. No. 13–06034–TLM, 2014 WL 174935, at *5 (Bankr. D. Idaho, Jan. 10, 2014). California law provides for interest at 10% per annum. Cal. Civ. Code § 3289(b).

Because of the long time between Hurtado's breach of the settlement agreement on October 15, 2007,[3] and trial of the adversary proceeding in January 2015, and because much of this delay is attributable to the actions of Hurtado, i.e., his filing a chapter 13 bankruptcy and his failure to schedule Jones, the court will award prejudgment interest on the settlement debt Hurtado owes to Jones.

Interest runs from the date of the breach of the settlement agreement. *See* Cal. Civ. Code § 3289. Prejudgment interest in a nondischargeability proceeding is calculated through the date of judgment. *See DeVries*, Adv. No. 13–06034–TLM, 2014 WL 174935, at *5. Using this method, Jones is also entitled to $156,724.32 in prejudgment interest.[4] Post-judgment interest will accrue under federal law. *See* 28 U.S.C. § 1961.

A judgment of nondischargeability under 11 U.S.C. § 523(a)(3) will issue in favor of Jones and against Hurtado in the amount of $363,089.32.[5]

**B.     Alter Ego**

Jones contends that Hurtado and URDECO are alter egos of each other. "The basic rule . . . in the application of this doctrine is . . . (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts are

---

[3] Hurtado's time for performance is omitted from the agreement. *See* Exh. P. ¶¶ 1, 3. As to paragraph 1 on removal of the third-party liens, Jones indicated a desire to have the liens removed "by the end of this week or at the latest by early next week." Exh. P at p. 2. That is insufficient time to remove the liens. The court will assign 60 days from the settlement agreement's memorialization by email, October 15, 2007, as a reasonable time for Hurtado to perform all the settlement's terms.

[4] Hurtado breached his agreement by failing to pay on October 15, 2007. Interest is calculated from October 16, 2007, through May 18, 2015. It is calculated as follows: $206,365.00 x 10% interest per annum ÷ 365 days per year = $56.54 interest per day. A total of 2,772 days elapsed between October 16, 2007, and May 18, 2015. 2,772 days x $56.54/day = $156,724.32.

[5] The full judgment amount comprises damages of $206,365.00 and prejudgment interest of $156,724.32.

treated as those of the corporation alone, an inequitable result will follow." *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837 (1962). *Associated Vendors, Inc.* summarized factors considered by courts that have addressed the doctrine of alter ego. *Id.* at 838–40.

The use of alter ego is intended to address the more extreme factual scenarios that would lead to an inequitable result if the doctrine were not applied.

> "Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. Under California law, a corporate identity may be disregarded where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. Under the alter ego doctrine, then, when the corporate form is used to [perpetrate] a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation."

*Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1082 (N.D. Cal. 2011) (citations omitted) (quoting *Sonora Diamond Corp. v. Super. Ct.*, 83 Cal. App. 4th 523, 538 (2000)) (internal quotation marks and ellipses omitted).

Jones has not sustained her burden of proof on this issue. She points to four reasons for applying the doctrine of alter ego in this case. First, URDECO was employed to perpetrate the fraud on Jones. But the evidence does not support such a finding. Instead, the court finds that URDECO had other legitimate business purposes, such as construction of custom and spec houses, including those in Rancho Santa Fe, and that Hurtado's misrepresentation was incidental to URDECO's main business activities. The misrepresentation did go to the essence of the contract with Jones but was not sufficiently integral to URDECO's business model to serve as a basis to pierce the corporate veil. Second, there was insufficient evidence of a unity of interest between Hurtado and URDECO. For example, the court notes Hurtado owned a 49% interest of the corporation and Blossman owned a 51% interest. And there was insufficient showing of a pattern of Hurtado's use of corporate assets for personal benefit. Third, funds were transferred between the entities. But Jones has not shown that the transfers were for anything other than a lawful purpose such as payment of a debt owed by one company

to the other or for services rendered. The mere transfer of monies between Hurtado's entities is insufficient to show unauthorized diversion of corporate funds for non-corporate uses. And the failure to segregate properly Jones's funds from the remainder of URDECO's other funds is not a sufficient basis to pierce the corporate veil. Fourth, the court did find that Hurtado misrepresented his URDECO ownership interest by stating that he was the sole owner of URDECO when he only had a partial ownership interest of 49%.

Considered together, Jones's reasons are an insufficient basis to impose alter ego liability. This court does not find a sufficient unity of interest between Hurtado and URDECO. Further, an inequitable result or injustice will not occur by regarding URDECO as a separate and distinct legal entity.

## II.    Fraud

Resolution of a dispute by settlement, even one that includes a mutual general release and contains no finding of fraud, does not bar an action to except the debt underlying the settlement from discharge under 11 U.S.C. § 523(a)(2). *Archer v. Warner*, 538 U.S. 314 (2003); *Brown v. Felsen*, 442 U.S. 127 (1979). As a result, the court looks to the underlying debt between Jones and Hurtado, and in particular the misrepresentation as to architectural licensure, to ascertain whether it supports an action for nondischargeable fraud.

### A.    Liability

To prevail under § 523(a)(2)(A) a creditor must show "(1) the debtor made a representation; (2) the debtor knew the representation was false at the time he or she made it; (3) the debtor made the representation with the intent to deceive; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained damage as a proximate result of the misrepresentation having been made." *In re Mbunda*, 484 B.R. 344, 350 (B.A.P. 9th Cir. 2012), *aff'd*, No. 13–60002, 2015 WL 1619469 (9th Cir. Apr. 13, 2015). It is well-settled that misrepresentations regarding professional licenses may form the basis of fraud under 11 U.S.C. § 523(a)(2). *Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214 (B.A.P. 1st Cir. 2002); *Torres v. Martinez (In re Martinez)*, No. RS 07-12037 DN, Adv. No. RS 07-

01140 DN, 2008 WL 954164 (C.D. Cal. 2008); *Willcox v. Carpenter (In re Carpenter)*, 453 B.R. 1, 5–6 (Bankr. D.D.C. 2011); *Bottari v. Baiata (In re Baiata)*, 12 B.R. 813 (Bankr. E.D.NY 1981).

First, Jones contends that Hurtado represented that he was a licensed architect. In California, the applicable law governing architects and the services they provide is the Architects Practice Act (the "Act"). *See* Cal. Bus. & Prof. Code §§ 5500–5610.7. The Act defines both "architects" and the "practice of architecture." *See id.* §§ 5500, 5500.1(a). Section 5500 provides, "As used in this chapter, architect means a person who is licensed to practice architecture in this state under the authority of this chapter." *Id.* § 5500.

Thus, if a person uses the term "architect" in California in connection with architectural services, that term carries a specific meaning defined by law as a person who is licensed as an architect under the authority of the Act. When a person who is not licensed uses the term, or a confusingly similar term, such use constitutes a misdemeanor carrying penalties including a fine or imprisonment in a county jail not exceeding one year, or both. *Id.* § 5536(a).

The purpose of the Act's licensure requirement, moreover, includes ensuring that architects have a basic level of competence. "As a condition for licensure, architects shall demonstrate a basic level of competence in the professional services listed in subdivision (b) in examinations administered under this chapter." *Id.* § 5500.1(c).

Jones recalls that Hurtado represented that he was an architect. Hurtado denies this assertion. After hearing both parties testify, the court finds Jones's testimony credible and Hurtado's testimony not credible. Jones's memory on this point was clear and specific. And she reiterated her testimony consistently several times over the course of the seven-day trial. When measured against Jones's testimony, Hurtado's denial that he had represented that he was an architect had less force.

Since Hurtado's status as licensed or unlicensed was within his personal knowledge, he knew his statement to Jones was false. Moreover, on the first date that Jones met Hurtado, Hurtado sent her loan officer an email introducing himself. Jones was copied on the email. In that email Hurtado used

the designation "A.I.A," which is the acronym for American Institute of Architects. While not itself unlawful, *see People v. Wright*, 139 Cal. App. 2d Supp. 927 (App. Dep't Super. Ct. 1956), the use of the initials "A.I.A." corroborates Jones's version of the facts.

Second, Hurtado's representation of licensure was made with the purpose and intent of deceiving Jones. "[E]ither actual knowledge of the falsity of a statement, or reckless disregard for its truth, satisfies the scienter requirement for nondischargeability of a debt." *In re Grabau*, 151 B.R. 227, 234 (N.D. Cal. 1993) (quoting *In re Houtman*, 568 F.2d 651, 656 (9th Cir. 1978)). The representation of architectural licensure was part of Hurtado's broader effort to convince Jones to hire URDECO. Hurtado told Jones that her plans drawn by her previous architect were defective, that he was an architect, and that, if she hired URDECO, he would repair her plans as part of the deal.

Third, Jones justifiably relied on Hurtado's representation that he held an architectural license. The standard for justifiable reliance lies midway between actual reliance and reasonable reliance. *In re Schnuelle*, 441 B.R. 616, 622 (B.A.P. 8th Cir. 2011). In explaining this standard, a treatise notes:

> A person may justifiably rely on a representation "even if the falsity of the representation could have been ascertained upon investigation. In other words, negligence in failing to discover an intentional misrepresentation" does not defeat justifiable reliance.

Kathleen P. March, Hon. Alan M. Ahart & Janet A. Shapiro, *California Practice Guide: Bankruptcy* ¶ 22:481 (Rutter Group 2014) (citing cases). The standard is "a mixture of objective and subjective standards." *In re Apte*, 180 B.R. 223, 228 (B.A.P. 9th Cir. 1995) *aff'd*, 96 F.3d 1319 (9th Cir. 1996).

Jones's reliance on Hurtado's claim of licensure was both actual and justifiable. Her reliance was actual because Jones testified that Hurtado's architectural license was an important factor in her decision to hire URDECO, and the court finds this testimony to be credible. In addition, Rancho Santa Fe required that homes be designed by licensed architects. Jones thought her original plans were incorrect and that further work by a licensed architect was required. As a result, she thought that she needed both an architect to correct her defective plans and a contractor to construct the home. Enter Hurtado, who told Jones that he owned URDECO, that he was the general contractor under which

URDECO operates, and that he was an architect—a statement that means he held an architectural license under California law. Thus, Jones was justified in relying on the representation that Hurtado was a licensed architect.

Fourth, Jones sustained losses as a proximate result of Hurtado's representation. *Ghomesh v. Sabban (In re Sabban)*, 600 F.3d 1219, 1221 (9th Cir. 2010). In *Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214 (B.A.P. 1st Cir. 2002), the bankruptcy appellate panel provided a roadmap for considering proximate cause under § 523(a)(2)(A) in the context of a misrepresentation as to licensure. Section 523(a)(2)(A) requires a direct link between the fraud and the debt to be excepted from discharge. *Id.* at 218. Referencing the Restatement (Second) of Torts §§ 525 to 549 (1977), the court described proximate cause as encompassing two elements: "causation in fact" and "legal causation." "Causation in fact requires that a debtor's misrepresentations be a substantial factor in determining the course of conduct that results in [the] loss." *In re Creta*, 271 B.R. at 219 (quoting Restatement (Second) of Torts § 546 (1977) (internal quotation marks omitted). The panel in *In re Creta* quoted the comments to the Restatement (Second) of Torts § 546 to further explain the principle: "[Causation in fact] is concerned with the question of whether the misrepresentation by the defendant has caused the plaintiff's loss at all. If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in the transaction[.]" *Id.* (internal ellipsis omitted). The court found that a misrepresentation about licensure goes to the heart of the contract, and once the plaintiff establishes reliance, the creditor has met its prima facie case on the question of causation:

> Thus, when an individual asserts that he possesses a refrigeration license, whether it be an apprentice's license, a journeyperson's license, or a master's license, he is making a representation that he possesses the necessary level of skill and knowledge to perform refrigeration and air conditioning work. A misrepresentation as to whether a debtor has such a license goes to the very essence of the agreement, i.e., the reliance by the contracting party that the debtor has the requisite knowledge, experience, and training to properly complete the work.
>
> When a creditor establishes that a debtor fraudulently induced the creditor to enter into a transaction by a misrepresentation that goes to the essence of the transaction, i.e., a debtor's training, competency or experience to complete the work contemplated by the transaction, the misrepresentation was a substantial factor in

23

> entering into the transaction, the debtor's work later appears defective, and the creditor suffers a loss, the creditor has established a *prima facie* case that the defects derive directly from the lack of professional qualifications of the debtor.

*Id.* at 220 (citations omitted).

Legal causation requires the plaintiff to establish that the loss was a foreseeable result of the false representation:

> [P]roximate cause under the Restatement requires [the plaintiff] to establish that its loss could reasonably have been expected to result from its reliance on the Debtor's misrepresentation. *See Restatement* § 548A comments a and b. In other words, was [the plaintiff's] loss foreseeable? Did the Debtor's misrepresentation tend to cause the losses or the likelihood that they would follow? Losses that could not be reasonably expected to result from the misrepresentation are not legally caused by it. In this case there can be little question that defective work is foreseeable if the Debtor does not have the qualifications that would be required of a licensed refrigeration technician . . . .

*Id.* at 221-22 (citations omitted).

The *Gem Ravioli* court also addressed the burden of proof as applied to § 523(a)(2)(A) actions arising from a licensure misrepresentation. It held that a plaintiff carries her initial burden of proof if she establishes: (1) a misrepresentation that goes to the "essence of the contract"; (2) that her reliance on the misrepresentation was a substantial factor in the retention of the unlicensed professional; and (3) that the loss sustained "could reasonably be expected to result from reliance on the misrepresentation." The burden then shifts to the debtor to prove that "intervening events, not the debtor's misrepresentation, are the factual or legal cause of the creditor's loss." *Id.* at 222.

Jones has satisfied each element for a prima facie case of proximate cause. Though not expressly mentioned in Jones's construction agreement with URDECO, Hurtado's representation of licensure goes to the essence of the agreement for three reasons. First, Rancho Santa Fe homeowners' association required that residences constructed within its boundaries be designed by licensed architects. Second, Jones was convinced (wrongly) by Hurtado that her existing plans were defective. And the court finds credible her testimony that she wanted a licensed architect to correct those drawings. This testimony is corroborated by the fact that Jones used a licensed architect to draw her original plans. Hurtado offered her a package deal though: construction work and correction of so-called problematic

architectural drawings.  Third, Rancho Santa Fe is a planned subdivision with high-end homes.  At all times during the construction of this home, Jones's standards were exacting.  It strains credibility to think that Jones would have been willing to accept the services of Hurtado had she known that he was not a licensed architect.

Further, Jones's reliance on Hurtado's false representation of licensure was a substantial factor in retention of URDECO.  Jones believed her plans were defective and needed to be corrected.  Hurtado's representation of his qualifications and competence, including his having an architectural license, weighed heavily into her decision to retain URDECO.  Jones credibly testified to this fact.

Finally, as set forth below, some of Jones's losses were of the type that could reasonably be expected to flow from a misrepresentation of licensure.  Jones's losses were largely work that San Diego County and/or Rancho Santa Fe homeowners' association required to be re-done because the design changes Hurtado made did not satisfy applicable code or rules.  From these facts, the court finds that Jones has sustained her prima facie case on proximate cause.  Hurtado has not put forth evidence from which a finding of an intervening cause could be sustained.

The court finds that Jones has satisfied all the elements necessary for fraud under § 523(a)(2)(A).  Therefore, Jones has sustained her burden of proof to show that a portion of Hurtado's settlement debt to her was a debt for money and services obtained by fraud.

**B.**    **Amount of Damages**

The bankruptcy court has discretion in an adversary proceeding to use the benefit-of-the-bargain damages or out-of-pocket damages.  *General Leasing Co. v. Anguiano (In re Anguiano)*, 99 B.R. 436 (9th Cir. BAP 1989).  In most instances, courts apply the out-of-pocket measure of damages.  *Id.*  In this case, the court finds that the out-of-pocket measure of damages adequately compensates Jones for her loss.  As such, the court looks to those damages that proximately flow from the licensure misrepresentation.  *See Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214 (B.A.P. 1st Cir. 2002).

### 1.    Out-of-Pocket Damages

Jones prays $290,311.91.  But her reasoning on the amount of damages lacks nuance.
URDECO, and by extension, Hurtado, performed two types of services on Jones's residence: contractor-
builder services and architectural services.  Not all of Jones's claimed damages are reasonably expected
to flow from the licensure misrepresentation; some of Jones's claims stem from URDECO's apparent
substandard contractor work.  Damages flowing from the misrepresentation as to architectural licensure
total $173,715.83.[6]  The remainder of damages claimed by Jones, a sum of $116,596.08, was not
proximately caused by this misrepresentation.[7]

---

[6]  This amount comprises the following damages: (1) Sun Engineering $6,950.00 (design fees to
determine fixes required); (2) Del Mar Blueprint $1,084.94 (reproduction of new drawings); (3) San
Diego County $4,827.63 (review costs and permits); (4) William Holcomb architect $1,256.40
(corrected/as-built drawings and permits); (5) Bureau Veritas $300.00 (interior inspection); (6) Ron
Bishop Construction, Inc. $112,075.82 (correct framing problems and frame the house per plans); (7)
Pine Tree Lumber $18,261.04 (repairs); (8) Gutterwerks $1,500.00 (re-do copper at doors and
windows); (9) Innovative Fire Protection $1,045.00 (changes to fire sprinklers arising from re-framing);
(10) APEX/Caso Plumbing $10,115.00 (plumbing corrections); (11) Pacific Coast Heating $1,175.00
(HVAC corrections); (12) North County Vacuum $125.00 (move vacuum line); and (13) Chase
$15,000.00 (costs to extend loan occasioned by delay).

[7]  The amount of damages not proximately caused by the licensure misrepresentation comprises: (1)
Craig & Associates $1,570.00 (re-survey costs); (2) CDC, Inc. $14,064.17 (concrete demolition); (3)
Hess Contracting $33,007.91 (demolish and re-pour four patio foundations); (4) Mike Lloyd $30,765.00
(correct site grading in backyard); (5) Perfection Floors $4,255.00 (grind slabs and correct and level
upstairs floors); (6) A 2 Z Deck Coating $7,900.00 (correct waterproofing/flashing at all windows and
sand floor deck); (7) Premier Construction $4,440.00 (correct protruding rebar at spa patio and BBQ);
(8) Wehanowicz Window & Door $5,500.00 (resolve incorrectly installed windows and re-do flashing);
(9) George Weir Asphalt $575.00 (damaged driveway cul-de-sac); (10) Michael Patti Painting
$3,000.00 (re-lacquer interior side of exterior doors and windows); (11) Murphy Sandblast $520.00
(sandblast entry); (12) Baynes Roofing $1,200.00 (correct roofing); and (13) SDG&E $9,749.00 (move
electrical transformer).

## 2.    Prejudgment Interest[8]

An award of prejudgment interest in a § 523 proceeding in which the creditor prevails ensures the creditor is made whole and has a full recovery.[9] To ensure that Jones is made whole, the court finds it appropriate to compensate her for the time value of money. This is particularly critical because of the passage of nine years between the fraud and judgment, as well as because Hurtado failed to schedule Jones as a creditor, which further delayed resolution of the issue.

Interest runs from the date of loss and continues to accrue even after the petition is filed. *See Foster v. Bradbury (In re Foster)*, 319 F.3d 495, 497 (9th Cir. 2003) (per curiam) (nondischargeable child support debt); *Ward v. Bd. of Equalization (In re Artisan Woodworkers)*, 204 F.3d 888, 891–92 (9th Cir. 2000) (nondischargeable tax debt); *Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 218 B.R. 916, 921 (B.A.P. 9th Cir. 1998) (nondischargeable student loan debt), *aff'd*, 193 F.3d 1083 (9th Cir. 1999). Thus, prejudgment interest in a nondischargeability proceeding is calculated through the date of judgment. *See DeVries v. Clark (In re Clark)*, Adv. No. 13–06034–TLM, 2014 WL 174935, *5 (Bankr. D. Idaho, Jan. 10, 2014). California law gives the trier of fact discretion to award interest in fraud actions. Cal. Civ. Code § 3288. Interest is calculated at 10% per annum. Cal. Civ. Proc. Code § 685.010(a). Using this method, Jones is also entitled to $138,439.31 in prejudgment interest.[10] Post-judgment interest will accrue under federal law. *See* 28 U.S.C. § 1961.

---

[8] Jones's Third Amended Complaint includes a prayer for prejudgment interest. Third Am. Compl., Prayer ¶ 1, filed June 16, 2015, ECF #203. But even if Jones had not done so, this court could award prejudgment interest. *See* Fed. R. Civ. P. 54(c) ("Every other final judgment [besides a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."), *incorporated by* Fed. R. Bankr. P. 7054(a); *Fed. Sav. & Loan Ins. Corp. v. Tex. Real Estate Counselors, Inc.*, 955 F.2d 261, 269–70 (5th Cir. 1992) (providing that catch-all prayer for "any other relief" to which the plaintiff is entitled supports award of prejudgment interest).

[9] See Discussion at Section I.A.3.b of the Memorandum.

[10] Jones's loss flowing from the misrepresentation as to licensure was fully extant when she terminated URDECO in May 2007. Interest is calculated from June 1, 2007, through May 18, 2015. It is calculated as follows: $173,715.83 x 10% interest per annum ÷ 365 days per year = $47.59 interest per day. A total of 2,909 days elapsed between June 1, 2007, and May 18, 2015. 2,909 x $47.59 per day = $138,439.31 of prejudgment interest.

A judgment of nondischargeability under 11 U.S.C. § 523(a)(2)(A) will issue in favor of Jones and against Hurtado in the amount of $312,155.14.[11]

## III.    Embezzlement

In the context of an adversary proceeding under 11 U.S.C. § 523(a)(4), embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States,* 160 U.S. 268, 269 (1885).  Embezzlement has three elements: "(1) property rightfully in the possession of a nonowner; (2) [the] nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *In re Hoffman,* 70 B.R. 155, 162 (Bankr. W.D. Ark. 1986); *see also In re Littleton,* 942 F.2d 551, 555 (9th Cir. 1991).

Jones claims that Hurtado is also liable for embezzlement of her $125,000 initial deposit.  The court disagrees.  This is a difficult proof where, as here, other persons who are not before this court, are also potentially liable for these acts.

Jones might have prevailed in two ways.  First, Hurtado may be directly liable if he, as opposed to any other of URDECO's employees, removed the money from the Jones account opened by URDECO.  Hurtado credibly denied at trial any participation in removal of these funds.

Second, Hurtado may also be liable for embezzlement if another URDECO employee embezzled funds and Hurtado knew or should have known of the other employee's wrongful acts. *See Sachan v. Huh (In re Huh),* 506 B.R. 257, 271–72 (B.A.P. 9th Cir. 2014) ("While the principal/debtor need not have participated actively in the fraud for the creditor to obtain an exception to discharge, the creditor must show that the debtor knew, or should have known, of the agent's fraud."). Assuming another employee embezzled Jones's initial deposit, Hurtado denies knowledge of such wrongful acts, and the court finds his denial credible.  Moreover, Jones has offered no evidence that he

---

[11]  That amount is comprised of damages of $173,715.83 and prejudgment interest of $138,439.31.

should have known of wrongful acts of others.  As a result, Jones has not carried her burden of proof on her embezzlement claim.

### CONCLUSION

For each of these reasons, judgment is for plaintiff Jones in the amount of $363,089.32.[12]  All of this amount is nondischargeable under 11 U.S.C. § 523(a)(3) and $312,155.14 of this amount is also nondischargeable under 11 U.S.C. § 523(a)(2)(A).  A judgment in favor of Hurtado and against Jones will issue on Jones's embezzlement claim under 11 U.S.C. § 523(a)(4).  Jones may recover costs.[13] Jones's request for attorneys' fees is denied without prejudice for failure to file an appropriate motion.[14] The court will issue a separate judgment.

Dated: May 18, 2015

Fredrick E. Clement
United States Bankruptcy Judge

---

[12]  The court finds that the awards under 11 U.S.C. § 523(a)(3) and 11 U.S.C. § 523(a)(2)(A) are not cumulative.  The settlement agreement fixed the total amount of Jones's damages.  But this court may look behind the settlement agreement to determine whether some, or all, of the underlying debt is not dischargeable under 11 U.S.C. § 523(a).  *Archer v. Warner*, 538 U.S. 314 (2003).

[13]  The manner and time for seeking costs is prescribed in Rule 292 of the Local Rules of Practice of the United States District Court for the Eastern District of California, incorporated by Local Bankruptcy Rule 1001-1(c).

[14]  The manner and time for seeking attorneys' fees is prescribed in Rule 293 of the Local Rules of Practice of the United States District Court for the Eastern District of California, incorporated by Local Bankruptcy Rule 1001-1(c).

## Instructions to Clerk of Court

## Service List

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below.  The Clerk of Court will send the Order via the BNC or, if checked ___, via the U.S. mail.

    Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and _____X_____ Other Persons Specified Below:

Scott R. Burton, Esq.
574 S. Rancho Santa Fe Rd.
San Marcos, CA 92078

Henry P. Friesen, Esq.
7545 Irvine Center Dr. #200
Irvine, CA 92618

Patti M. Jones
P. O. Box 9834
Rancho Santa Fe, CA 92067

Brian P. Moquin, Esq.
3506 La Castellet Ct.
San Jose, CA 95148